No. 16,023.

SCHNEIDER *v.* THE PEOPLE.

(199 P. [2d] 873)

Decided October 4, 1948.   Rehearing denied November 8, 1948.

Mr. J. CORDER SMITH, Mr. ROYAL C. DUNCAN, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr.

Duke W. Dunbar, Deputy, Mr. James S. Henderson, Assistant, for the people.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

In an information filed in the district court of Washington county, Paul J. Schneider was charged with the murder of one Frank J. Ford, on September 20, 1947. Defendant was indigent, and counsel was appointed to defend him. Upon arraignment, defendant entered a plea of not guilty, and not guilty by reason of insanity at the time of the alleged commission of the crime and since.

Upon trial the jury returned a verdict of murder in the first degree and fixed the penalty at death. To review the judgment entered upon that verdict, defendant prosecutes a writ of error.

It appears from the record that upon the entry of the plea of not guilty by reason of insanity at the time of the alleged commission of the crime and since, the court entered an order committing defendant to the State Hospital at Pueblo, Colorado, for observation for the period of a month. Thereafter, and on the 6th day of December, 1947, three of the hospital physicians reported to the court that in their opinion Schneider was not insane at the time of their examination nor was he insane at the time of the alleged commission of the crime.

The case was set for trial on January 19, 1948, at the conclusion of which, on the 23rd day of January, 1948, the jury returned its verdict as noted. Within the time allowed by the court, counsel for defendant filed a motion for a new trial, alleging ten errors committed during the course of the trial. The motion for a new trial was argued on February 13, 1948, at the conclusion of which the court entered an order overruling the motion

and pronounced the judgment sought to be reversed here.

The record discloses the following evidence on behalf of the people: On the night of September 20, 1947, Frank J. Ford was operating a filling station owned by himself and son, located on Brighton Boulevard in Denver. Ford usually returned from the filling station at about 11 o'clock P.M., and, when he failed to return at the usual time, Mrs. Ford became alarmed and notified police. Some officers, in response to her call, went to the filling station, found it open and Ford's car there, but Ford was gone, and all of the money in the cash drawer had been removed therefrom, with indications that it had been rifled. From the night of September 20, 1947, nothing was seen or heard of Mr. Ford until his body was discovered in Washington county more than thirty days later.

On the 20th of September, 1947, Ford had in his possession as a cash item a check in the sum of $40.57, payable to the order of Elmer Bloom and drawn on the Central Bank and Trust Company by Reed & Green Planing Mill, which check had been cashed by the payee at Ford's Service Station on the date above mentioned. On October 8, 1947, the Central Bank and Trust Company received the Bloom check for collection from the Pikeville National Bank of Pikeville, Kentucky, bearing the endorsements of Paul Bloom and Paul J. Schneider. The Central Bank and Trust Company honored the check and remitted the amount thereof, less a service charge, to the Kentucky bank. It was known by the officers that the Bloom check was in Ford's possession on September 20, at the time of his disappearance. The Kentucky police officers, cooperating with the Denver police and accompanied by an agent from the Federal Bureau of Investigation, who had theretofore been investigating Schneider's activities pertaining to a reportedly stolen automobile, apprehended Schneider when he called at the Pikeville National Bank to receive the pro-

ceeds of the Bloom check. Upon being interrogated, he denied all knowledge of Ford and claimed that the check had been given to him by a party in Denver as the purchase price of a radio. Subsequently, and on the morning of October 22, 1947, defendant made a full and complete confession of all of his activities in and around Denver on September 20, 1947, to an agent of the Federal Bureau of Investigation and the Chief Deputy Sheriff of Pike county, Kentucky. Subsequently he repeated his confession to Captain James Pitt and Detective Joe Holindrake, police officers from Denver, and several citizens from Pikeville, Kentucky. After defendant was returned to Denver, and on October 25, 1947, his confession was repeated in the presence of Captain Pitt, Detective Holindrake, and Sergeant Duffy. All of the officers testified that defendant's confession was free and voluntary, and this is undisputed.

Defendant's confession, as made to these various officers on different occasions, and, so far as it pertains to defendant's activities in Denver and subsequent thereto, is substantially as follows:

Defendant stated that the day of Mr. Ford's disappearance, he had arrived in his car in Denver sometime right after noon. He drove around Denver for several hours, looking for a likely place to "stick up," and finally decided to leave Denver to go into Nebraska. After dark he drove out Route 6 and passed a filling station and shortly afterward turned around and came back to the filling station. When he returned some of the lights had been turned out, and Ford, who was operating the station, was evidently closing. When he drove in Ford came out, whereupon he pulled his gun on Ford and told him he wanted his money and didn't want any trouble with him. He then got out of the car, went into the office, took Ford's billfold and what money was in the cash register. He wrapped the billfold and money in a cloth found in the filling station, took Ford out and ordered him to drive the car out on Route 6. After thus

driving a short distance, he ordered Ford to stop the car, and he then put him in the trunk, and continued to drive out on Route 6. After driving some distance he stopped at an "all-night" filling station to get some gasoline, but he had told Ford previously that he intended to stop for gas and that Ford was to give no alarm or make any outcry while he was stopped. After having driven approximately 100 miles from Denver, the headlights of his car shone upon a bridge abutment, or the bridge itself, and he slowed down and stopped. Thereafter he drove to the right of the highway on a sort of a lane or small road for a distance of about two car lengths, when he again stopped, alighted from the car, opened the trunk, pulled Ford out, and ordered him to take the rag in which the money and billfold had been placed and blindfold himself, then told him to walk down a rather steep ditch or creek bank under a bridge so that he could not be seen from the highway, and while there tried to make up his mind what disposition to make of Ford because, as he said, he had never harmed a man before and he didn't know just what to do with him. After thinking it over for a time he decided he would hit Ford over the head with an iron bar which he had in his possession and which was about the circumference of a nickel. He carried out his decision, and in doing so used both hands. Ford fell to the ground and remained down for a short time, but then arose and sort of staggered toward defendant. The blindfold at that time had fallen from Ford's eyes so defendant decided to take him away from that place. At this time a truck was coming from one direction and a car from the opposite direction. He told Ford to lie down so the lights of the car or truck would not shine on him, and Ford got down on all fours. About the time the truck went by Ford suddenly raised up, picked up a rock or hard piece of dirt, and struck defendant with it, whereupon he fired at Ford, who started to run. He then fired another shot at Ford, after which he saw him no more,

but heard him running away. He backed his car out onto the highway and proceeded easterly.

Defendant first confessed the murder of Ford on the morning of October 22, 1947, to officers in Pikeville, Kentucky, and at the time, and as a part of his confession, he related two similar crimes which he had committed in Michigan subsequent to September 20. This entire confession was subsequently repeated to other officers as we have noted. According to the record, Schneider's confession of the other similar crimes is substantially as follows:

On the night of October 7, 1947, he drove from Pikeville, Kentucky, to Detroit, Michigan. As he was nearing Detroit he decided he would pull a "stick up" of another service station. He passed a station probably around 10:30 that night near Detroit and noticed a car parked there getting gas, so he continued on his way and went into Detroit. There he spent approximately an hour and then returned to this station. He drove into the station, where one attendant was on duty. He told the attendant, "this is a stick up," and leveled his gun at him, saying that he wanted his money and he didn't want any trouble with him. He then went into the office, obtained money and other valuables there, and told the attendant to turn off the lights so that no one would drive in while the "stick up" was in progress. The attendant replied that if he turned off the lights, another man on duty would be awakened. Defendant then deciding that he would have to take the attendant with him, placed him in the trunk of the car and locked it. He proceeded off the main highway upon which the station was located and drove for several miles. He never had been in that vicinity before and was unable to give any exact description of the roads which he traveled. He drove off the main highway, pulled the attendant out of the trunk of the car, intending to tie him up and leave him, but the attendant resisted being tied up, and he struck him across the back of the neck with an iron rod. The at-

tendant fell to the ground, and he struck him a second time, after which he pulled the body off the road for some distance, placing a part of a tree trunk over it and left it there. He then drove back toward Detroit and entered a filling station near that city. At this time, as he stated, he had no intention of "sticking up" this second station, but was going to buy a used tire; however, while there he decided he would make the "stick up." He pulled a gun on the attendant and told him it was a "stick up." This attendant he also placed in the trunk of his car, drove off of the highway for a distance of several miles, where he took the second service station attendant from the trunk, but decided that it would not be wise to release him, because if he did so he would furnish the authorities with information which would implicate him with the previous "stick up" near Detroit. For this reason alone, and to prevent the furnishing of this information, he decided that he would do away with this man, whom he hit over the head with an iron rod, left the body, got into his car, and continued on into Detroit. He stated that he knew that he had killed the second attendant.

Defendant, in his confession, described the location of the bridge on the highway where he struck Ford and where he fired the shots, and from this description the officers were able to locate Ford's body in an enclosure some 200 feet from the highway, practically hidden from it by weeds. The body was in a highly decomposed condition, and, because thereof, an autopsy did not disclose positive evidence of a wound caused by a firearm, but did disclose that death was caused by a concussion and basal skull fracture. The physician who performed the autopsy testified that the injury inflicted by the blow on the head caused Ford's death.

At the time of defendant's arrest he had on his person a 32 caliber Savage automatic pistol with ten cartridges and a clip, which pistol he carried in a shoulder holster. He had in his possession also a tire gauge which he ad-

mitted belonged to, and by other witnesses was identified as one owned by, Ford, and a copy of a Denver newspaper, dated September 21, which he stated he had purchased for the purpose of learning whether there was any news item therein with reference to the Ford "hold up." He had other articles which belonged to Ford and which, according to the evidence, were in Ford's possession at the time of the "hold up." At or near the bridge on the highway where the shots were fired at Ford, was found a 32 caliber shell which an expert testified was fired in the pistol found on defendant at the time of his arrest in Pikeville, Kentucky.

Defendant did not take the witness stand, but his brother Edward and a sister Dorothy were called in his behalf. They testified to injuries suffered by him in accidents during his childhood, and as to others received by him in August, 1947, in an auto accident. According to these witnesses, in the auto accident occurring in August, defendant suffered a fractured skull and his arms and hands were lacerated, and they stated that neither of them was permitted to see him in the hospital for the first three days he was there. They also testified that defendant stated to them that he did not know how the August auto accident happened but that apparently he went through the windshield and laid on the edge of the highway for approximately six hours. They further testified that he had some injury to his head, and that, as a result of this injury, defendant seemed nervous and upset, and stated to them that his head hurt him and that he was dizzy.

The people called the physician who attended defendant for the injuries incurred in the August, 1947, auto accident, who testified that upon defendant's admission to the hospital he was suffering from shock, but that there were no complications whatever, and the only treatment required was such as would prevent infection in any of the lacerations. This physician denied the testimony of defendant's brother and sister, that no visitors

were permitted to see defendant for the first three days while he was in the hospital, but stated that visitors were permitted from the time he was brought there. At the time defendant was discharged he was in good physical condition, with no brain or other complications.

The three physicians who observed defendant at the State Hospital at Pueblo for a thirty-day period to determine whether he was insane at the time of the alleged commission of the offense and subsequent thereto, gave, as we have noted, their opinion that he was not at the time of the trial insane and was not insane at the time of the alleged commission of the crime.

The jury returned a verdict, as we have noted, finding defendant guilty of murder in the first degree and fixing the penalty at death.

There are five assignments of error, only one of which, however, is seriously urged, viz., that relating to the admission of defendant's entire confession and particularly the part thereof in which he confessed the commission of the two crimes in the state of Michigan.

Concerning evidence of the Michigan crimes, counsel for defendant tendered the following instruction, which the trial court refused to give:

"Certain testimony concerning other alleged crimes committed by the defendant has been introduced in this case.

"The law requires that only evidence which tends to prove a material element of the crime charged in the information be admitted in evidence.

"The testimony concerning said other alleged crimes shows that said crimes had nothing whatsoever to do with the particular crime charged in the information, and, therefore, said testimony has no probative value whatever.

"You are, accordingly, instructed to disregard entirely all evidence concerning said other crimes."

All the evidence with reference to the crimes committed by defendant in Michigan was offered by the people

and admitted by the court "only for the purpose of showing the intent, the scheme, plan and design and motive of the defendant in the commission of the Colorado crime; that is, this testimony which will come now will be offered simply for that purpose." When defendant freely and voluntarily confessed that he murdered Ford on September 20, 1947, in the same confession and at the same time he freely and voluntarily confessed that he had subsequently, and a short time thereafter, committed two similar crimes in the state of Michigan, and that the Michigan crimes were perpetrated in substantially the same manner and for a like purpose as was that committed in the murder of Ford. When evidence of the Michigan crimes was offered as part of one confession, defendant's counsel objected thereto as irrelevant and immaterial and also as prejudicial and inflamatory. The court, in overruling the objection, stated that the court would instruct the jury as to the purpose of the admission of the testimony of other crimes and the limited use that it might make of such evidence in its deliberations. The instruction given by the court and to which defendant objected read:

"You are instructed that the defendant is being tried solely upon the charge alleged in the information.

"While evidence has been admitted in this case of two other crimes alleged to have been committed by the defendant in the state of Michigan, such evidence was admitted solely for the purpose of showing intent, motive, plan, or design, of the defendant in the alleged commission of the act charged in the information. Such evidence is to be considered by you for the indicated purpose only, and under no circumstances are you to consider it for any other purpose whatsoever."

█ Counsel for defendant rely upon the general rule that evidence is inadmissible which shows, or even tends to show, that the defendant has committed a crime wholly independent of the offense for which he is on trial, but they also recognize that there are many ex-

ceptions to this rule. In Colorado we have held that some of the exceptions to the general rule, equally well-settled as the rule itself, are that it is competent to show that defendant on trial for a specific offense has participated in similar crimes in order to establish either motive, intent, plan, design or scheme, and to establish defendant's identity, and such evidence is not inadmissible merely because it establishes that defendant is guilty of another crime. *Warford v. People,* 43 Colo. 107, 96 Pac. 556; *Jaynes v. People,* 44 Colo. 535, 99 Pac. 325; *Hillen v. People,* 59 Colo. 280, 149 Pac. 250; *Bacino v. People,* 104 Colo. 229, 90 P. (2d) 5; *Rogers v. People,* 104 Colo. 594, 94 P. (2d) 453; *Coates v. People,* 106 Colo. 483, 106 P. (2d) 354; *Torbert v. People,* 113 Colo. 294, 156 P. (2d) 128; *Paine v. People,* 106 Colo. 258, 103 P. (2d) 686; *Williams v. People,* 114 Colo. 207, 158 P. (2d) 447; *Perry v. People,* 116 Colo. 440, 181 P. (2d) 439.

The general rule for which defendant contends is inapplicable in the present case. Here, defendant, so far as is disclosed by the record, made a free and voluntary confession in which he not only admitted the murder of Ford, with which crime he was charged, but in the same confession, at the same time, and as an integral part thereof, he admitted that he had been guilty of similar robberies, kidnappings and murders subsequent to the one for which he was to be tried. Here the only question for our determination is whether the entire confession was properly admitted, or whether only that part directly pertaining to the Ford murder was admissible. In determining this question we have read and carefully considered all decisions called to our attention by defendant as well as many others. We find that there is a great diversity of opinion as to the admissibility of an entire confession, but have concluded that in this and some other jurisdictions the question has been determined adversely to defendant's contention.

In *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71, defendant entered a plea of guilty of murder, and, upon

the entry of this plea, the sole questions for the jury's determination were the degree of murder and the penalty to be inflicted in the event it should determine that the admitted crime was murder in the first degree. Reppin, a minor, made a confession, evidence of which was introduced at the trial. In his confession he admitted some participation in a "stick-up" in New Jersey and also acknowledged a "vision" of some plan or scheme with reference to the organization of a "gang" for the purpose of holding up the Broadmoor Hotel in Colorado Springs, and also an abandoned plan in connection with the "hold up" of the "Pot and Spigot" in Colorado Springs. He also admitted the burglary of a business establishment in Colorado Springs, and his participation in several other holdups there. These statements, made by defendant in his confession, were admitted in evidence, and when he took the witness stand in his own behalf, in answer to questions propounded him by his appointed counsel and the deputy district attorney, made substantially the same statements as those contained in his confession. Mr. Justice Butler delivered the opinion of the court reversing the judgment pronounced on the verdict of the jury, which found the defendant guilty of murder in the first degree with the death penalty attached. The court recognized the rule announced in *Warford v. People, supra, Hillen v. People, supra,* and *Jaynes v. People, supra,* but observed that the trial court, although not requested so to do, failed to instruct the jury as to the purpose and limitation of the admitted evidence relating to other offenses,· and with reference thereto said:

"The court erred in permitting the chief of police to testify, over the defendant's objection, to the defendant's statements with reference to his 'vision' concerning a holdup at the Broadmoor hotel, and those with reference to the Pot and Spigot incident. No holdup occurred, nor was one even attempted. That testimony does not come

within any exception to the rule excluding evidence of other offenses. The error was prejudicial and reversible.

\* \* \*

"The offenses committed in El Paso county were of the same character as the crime charged; they were sufficiently connected in point of time to meet the requirements of the law; and the same motive may reasonably be imputed to them all. *The evidence thereof bore upon the intent with which the defendant shot Regan and the motive that prompted the act, and was admissible, but only for the purpose of determining such intent and motive.* [citing cases] Such evidence was not rendered inadmissible by the fact that the trial was upon a plea of guilty instead of upon a plea of not guilty. *It cannot successfully be contended that as a plea of guilty raises no issue of intent, evidence of other offenses is not admissible to show intent.* If such were the case, evidence of the homicide itself would not be admissible upon a plea of guilty, because such a plea admits the homicide. That, of course, is not the law. When such evidence would be admissible where the plea is not guilty, it is admissible where a defendant pleads guilty and evidence is submitted to a jury under section 6665, supra [section 32, chapter 48, '35 C.S.A.].

"*Although such evidence was admissible for a limited purpose only,* the court did not, either when the evidence was received or in the instructions to the jury, limit it to the purpose for which it was admitted and for which alone it was admissible.

"We have called attention to the grave danger that evidence of other offenses may be misapplied by the jury to the injury of the accused, and have said that when such evidence is offered the district attorney should state the purpose for which it is offered, and that when it is received the trial court should limit it to the purpose for which it is admitted. True, in this case no request to so limit it was made by appointed counsel for the defendant, and we have not held that in such cir-

cumstances the court's failure so to limit the evidence is reversible error. But we have not had occasion heretofore to consider the effect where, as here, the defendant is a minor.

\* \* \*

"In a homicide case, where the question is whether a minor defendant shall live or die, it should be, and we hold that it is, the duty of the court, without request, to explain to the jury the purpose for which evidence of other offenses is admitted, and to direct the jury to consider it for that limited purpose only. *The failure of the court in this respect in the present case was highly prejudicial to the defendant and was reversible error.*" (Italics ours)

In the instant case evidence of other similar crimes, which defendant confessed he had committed, was offered and admitted as part of his confession; the district attorney, at the time the evidence was offered, stated the purpose for which it was offered, and the trial court in its instructions to the jury specifically limited the evidence to such purpose.

In *Williams v. People, supra,* defendant was found guilty of murder of the second degree and of concealing the death of a bastard. She had made a confession in which she stated that there were two children, other than the one named in the information, which had been born to her, and that she had drowned all three of the children and had made the same disposition of their bodies. In other words, in her confession defendant admitted the murder of two children other than that of the one charged in the information upon which she was to be tried. Her counsel objected to the admission of the evidence contained in defendant's confession relating to the death of the two other children. With reference to the admissibility of this evidence, we said:

"Error is urged in the admission of evidence of other offenses. Our attention is particularly called to four objections or motions with regard to such testimony

made in behalf of defendant during the trial. The first of these was a motion to strike from the evidence of the assistant deputy coroner testimony relative to any child other than the one named in the information. There had been repeated evidence as to the finding of the three bodies by other witnesses without objection and this evidence was so intermingled that it was impossible to prove the case relied upon without also bringing out the facts as to the finding of the other bodies. This motion was properly denied. The second was an objection to testimony of the city pathologist following his answer that he had occasion to examine babies' bodies brought to the morgue; that 'two he just looked at externally; a third he made an autopsy on.' Then the question was asked, 'Describe the condition of that body,' and this was objected to by defendant's counsel. There was no merit to that objection. *The third was an objection to the admission of defendant's written confession, and the fourth was a motion that the confession be withdrawn and the jury instructed to disregard it, both on the ground that the confession involved three separate alleged crimes. These were without merit, under the rule that 'where the confession contains a mention of another crime committed by the accused,' his 'allusion to it in his confession may and must be listened to if it is a part of the one entire statement confessing the crime charged at bar.'* Wigmore on Evidence (3d ed.), vol. VII, p. 407, §2111 (e).

"Going beyond the specific objections made by counsel, from a careful study of all the record the only evidence to which counsel can refer as involving other crimes is that concerning the finding and condition of the bodies of the two babies other than the one upon which the prosecution was based. No attempt was made to charge or prove any criminal intent of defendant in connection with the two older bodies. In addition to the fact that this evidence was so intermingled that it was impossible to make proof regarding the finding of the

one body without showing the finding of the other two, *the evidence concerning the two earlier babies was admissable otherwise in proof of deliberation in the crime charged, rather than the frantic hysteria of tragedy and inexperience, and also in proof of a preconceived plan of disposing of defendant's offspring in case of pregnancy resulting from her amours.*

\* \* \*

"Error is urged in that the court waited until its general charge to instruct as to the application of evidence of the finding of the other bodies to the purpose for which it was admitted, instead of so instructing immediately upon its admission.

"In its general charge the court properly instructed the jury as to the limited purpose in which this evidence was received. No motion was made by defendant from time to time as the evidence was received that the court instruct on the application of such evidence to the purpose for which it was admitted. Generally it is advisable upon tender of such instruction by defendant to give it at the time; however, there must be some presumption of intelligence of the jury and the proper instruction given at the end of the case rather than at the time the evidence is received is not prejudicial error [citing cases]." (Italics ours)

From a careful consideration of our decision in *Reppin v. People, supra,* and *Williams v. People, supra,* we are persuaded that in this jurisdiction when a defendant charged with a criminal offense, even though that offense be murder, makes a free and voluntary confession, either oral or written, in which he admits his guilt of the offense charged, and in the same confession and at the same time admits that he participated in and committed other similar offenses, such confession is admissible in evidence and is relevant and may be considered by the jury as bearing upon the motive, intent, plan, scheme and design to establish the commission of the crime charged. When such a confession is offered in its

entirety, the district attorney should explain the purpose for which the evidence of offenses other than that charged is offered, and the court should instruct the jury as to the purpose of the evidence and that it is limited in its consideration of such other offenses. If this procedure is followed, no error is committed. *Roberts v. People,* 11 Colo. 213, 17 Pac. 637; *Silliman v. People,* 114 Colo. 130, 162 P. (2d) 793; *People v. Rogers,* 192 N. Y. 331, 85 N.E. 135; *Gore v. People,* 162 Ill. 259, 44 N.E. 500; *People v. Hurry,* 385 Ill. 486, 52 N.E. (2d) 173; *Robinson v. U. S.,* 63 F. (2d) 147; *State v. Dalton,* 43 Wash. 278, 86 Pac. 590; *Commonwealth v. Gable,* 323 Pa. 449, 187 Atl. 393; *Commonwealth v. Hipple,* 333 Pa. 33, 3 Atl. (2d) 353; *State v. Knapp,* 70 Ohio St. 380, 71 N.E. 705; *Commonwealth v. Wood,* 142 Pa. Sup. Ct. 340, 16 Atl. (2d) 319; *State v. Palko,* 122 Conn. 529, 191 Atl. 320; *State v. Kelly,* 16 N. C. 627, 6 S.E. (2d) 533; *Grove v. State,* 185 Md. 476, 45 A. (2d) 348; 2 Bishop's New Criminal Procedure, p. 1059, §1241; 7 Wigmore on Evidence (3d ed.), p. 497, §2100 (3); 2 Wharton's Criminal Evidence (11th ed.), p. 1012, §606; 20 Am. Jur., p. 425, §488.

Counsel for defendant were appointed by the trial court, and have continued to represent him here. They have been assiduous and untiring in his behalf, and have safeguarded his every right under the law. They afforded their client every protection. We, too, have carefully examined the record and have considered all objections made during the trial as well as the assignments of error here, and find that defendant had a fair and impartial trial, and that his guilt was established beyond any doubt. It is the law that one who commits murder, as did defendant here, must suffer the penalty prescribed by the jury.

The judgment accordingly is affirmed, and it is ordered that it be executed during the week commencing December 12, 1948.

Mr. Justice Hilliard and Mr. Justice Hays dissent.

Mr. Justice Hays dissenting.

I dissent from the court's opinion in this case because of the prejudicial error which intervened, as I view it, by reason of the admission in evidence of proof of two unrelated and disconnected crimes alleged to have been committed by defendant in Michigan subsequent to the one involved herein.

We have held that such evidence should be admitted, if at all, with great caution and only in cases where it is clearly *relevant* to some issue involved (*Dockery v. People,* 74 Colo. 113, 115, 219 Pac. 220), or where it "tends to prove some *element* of the one for which the accused is being tried." *Jaynes v. People,* 44 Colo. 535, 543, 99 Pac. 325; *Coates v. People,* 106 Colo. 483, 488, 106 P. (2d) 354.

In *Wood v. People,* 60 Colo. 211, 213, 151 Pac. 941, evidence was admitted of other transactions and we reversed the judgment because such evidence was *"wholly irrelevant,* for the simple reason that their proof was not essential, or in any wise necessary * * *."* In *Reppin v. People,* 95 Colo. 192, 34 P. (2d) 71, we said that *"incompetent* and *irrelevant* evidence should be excluded" and, quoting from *Jaynes v. People, supra,* stated, "that such evidence [of other offenses] tends to create a prejudice in the minds of the jury; but of this he will not be permitted to complain if the evidence is *competent* and his rights are safeguarded in the manner we have suggested."

The above rule has been stated in various ways, but never more clearly set forth than in *Hamilton v. People,* 87 Colo. 307, 310, 287 Pac. 651, where Mr. Justice Burke, now chief justice, in delivering the opinion of the court, said: "The true rule is that evidence of former convictions or other offenses may not, in the first instance, be

directly or indirectly introduced if not *material* and *relevant* to the fact in issue."

Concerning the same rule, Judge Bliss, speaking for the supreme court of Iowa, in *State v. Rand* (Iowa), 170 A.L.R. 289, 300, 25 N.W. (2d) 800, said: "The basic reason [for excluding proof of other crimes] is that the commission of another crime ordinarily has no proper *relevance* to the commission of the crime for which the defendant is being tried. One may be an habitual criminal and yet innocent of the crime for which he is indicted and being tried. And yet the proof of an independent crime while logically of no *relevance,* may incline the mind of a juror more readily to the belief that the defendant might have committed the crime with which he is under charge. *For this reason courts should be vigilant in the exclusion of such evidence when it is without relevance or there is fair doubt of its relevance. It is thus seen that the admissibility of such testimony is all a matter of relevance. The test of admissibility is the connection and relevance of the facts proved with the offense charged—whether it fairly tends to prove that particular offense or an essential element thereof."* (Italics supplied)

In 20 Am. Jur., 298, section 316, we find: "In a prosecution for one crime proof of another direct substantive crime is never admissible unless there is some legal connection between the two, upon which it can be said that one tends to establish the other or some essential fact in issue. The courts stress the importance of this requisite due to the nature and prejudicial character of such evidence. The question of relevancy is obviously one to be decided in the light of the facts and circumstances in the particular case." Section 311, id., contains the statement: "The rule excluding evidence of the commission of other offenses by the accused in a criminal case for the purpose of showing the commission of the particular offense with which he is charged does not deprive the state of its right to make out its whole

case against the accused on any evidence which is otherwise relevant upon the issue of the defendant's guilt of the crime with which he is charged. In making proof, it is competent for the prosecution to put in evidence all relevant facts and circumstances which tend to establish any of the constituent elements of the crime with which the accused is charged, even though such facts and circumstances may prove or tend to prove that the defendant committed other crimes."

In 22 C.J.S., page 1105, section 686, it is said: " * * * where intent is not of the essence of the offense charged, or is not an element thereof, or is immaterial or not involved, or where accused is not shown to have some connection with the other offenses, or where the nature of the offense is such that proof of its commission as charged carries with it an implication or presumption of criminal intent, the act charged characterizing the offense, evidence of the perpetration or attempted perpetration of other like offenses is inadmissible, * * *."

The exclusion of similar-fact evidence is the subject of an extensive and scholarly article by Julius Stone in 51 Harvard Law Review, 998, wherein the origin and development of the rule of exclusion is carefully treated, and leading authorities analyzed. It is there pointed out that the "perplexing variety of holdings" by many courts is due to "disregard of the basic test of the original rule, namely — is this evidence relevant to an issue other than propensity?"

In the light of the foregoing authorities it is thoroughly established that admissibility of evidence concerning other convictions or offenses depends upon whether or not such evidence proves or tends to prove some essential element in the case on trial.

In the present case defendant confessed not only to committing the Colorado crime, but also the two alleged Michigan crimes, and Justice Alter, in delivering the opinion of the court, said in effect: "the only question for our determination is whether the entire confession is ad-

missible or whether only that part of the confession, directly pertaining to Ford's murder, was admissible with that part of the confession pertaining to other murders deleted therefrom. In determining this case we have read and carefully considered all decisions called to our attention by defendant as well as many other decisions. We find that there is great diversity of opinion as to the admissibility of the entire confession, but have concluded that in this and some other jurisdictions the question has been determined adversely to the defendant's contention.

As to whether or not there is diversity of opinion elsewhere with respect to the admissibility of the entire confession, we are not, as I see it, concerned. The question is set at rest in Colorado by the above decisions of this court, which are consistent with the weight of judicial authority elsewhere, to the effect that all relevant portions of said confession are admissible and all irrelevant parts thereof inadmissible. No other test than relevancy is justified or permitted under our decisions.

The court in the majority opinion cites the case of *Reppin v. People, supra,* as authority for the proposition that all of said confession must be admitted and that none thereof may be excluded. I do not so interpret that case; in fact, as I view it, the Reppin case is in direct conflict with the opinion of the court in this case as I will now show.

In that case the chief of police testified concerning a conversation he had with the defendant, wherein defendant confessed to the making of certain plans with respect to a holdup of the Broadmoor Hotel in Colorado Springs; that he had been arrested in New Jersey for conspiracy; and that he had gone to a place called the Pot and Spigot with the intention of holding it up, and to other matters of similar character. In reference to this confession of the defendant, as related by the chief of police, we said:

"The court erred in permitting the chief of police to

testify, over the defendant's objection, to the defendant's statements with reference to his 'vision' concerning a holdup at the Broadmoor Hotel, and those with reference to the Pot and Spigot incident. No holdup occurred, nor was one even attempted. That testimony does not come within any exception to the rule excluding evidence of other offenses. The error was prejudicial and reversible.

"For the same reason it was prejudicial and reversible error to admit that part of the confession that related to the defendant's arrest in 1931, in New Jersey, for conspiracy."

There were three separate incidents recited in the confession of the defendant, which we held to be irrelevant to any issue in the case, and, as a result, the admission of evidence concerning them was prejudicial to defendant, and constituted reversible error. Other parts of the confession found to be relevant to the issues were properly admitted in evidence.

There is nothing in *Williams v. People*, 114 Colo. 207, 158 P. (2d) 447, or in any of the other authorities cited by the court in support of its opinion, contrary to the above statement or which requires the admission of irrelevant and incompetent evidence even though it forms a part of an "entire confession."

The sole and only remaining question herein, is whether or not proof of the Michigan crimes is relevant to some issue in the instant case. The determination of this question requires at the outset an examination of the applicable statute, section 32, chapter 48, '35 C.S.A., which provides: "All murder * * * which is committed in the perpetration or attempt to perpetrate any * * * robbery, * * * shall be deemed murder of the first degree." Under our decisions, the killing during the perpetration of a robbery without further proof constitutes murder of the first degree. *Jones v. People*, 93 Colo. 282, 285, 26 P. (2d) 103; *Reppin v. People, supra*. There are consequently but two elements of the crime of mur-

der under the above provision of the statute, namely, the killing and the robbery.

In the trial court's instruction set forth in full in the majority opinion, it was stated that the evidence of the Michigan crimes was "admitted solely for the purpose of showing intent, motive, plan, or design, of the defendant in the alleged commission of the act charged in the information."

In overruling defendant's motion for new trial, the trial court observed, inter alia: "I think it then becomes important to determine what the defendant intended at the time he struck the blow. I think that the evidence as admitted, of the subsequent acts where the same instrument was employed and where death resulted, was properly admitted to establish the fact that at the time he struck the deceased in this case, he intended to accomplish his death, and did in fact accomplish it."

While "motive, plan or design" are expressly mentioned in the instruction given, there was no specific reference thereto in the findings of the trial court at the time of the overruling of the motion for new trial, and it is clear from such findings that the evidence concerning the Michigan crimes was admitted only for the purpose of showing "intent," and not to show "motive, plan, or design." In passing, it is interesting to note that the trial court found the evidence of the Michigan crimes was not admissible for the purpose of establishing "identity" because, "I felt that the identity of the defendant had been sufficiently established." No doubt by the same token if the court had been convinced that "intent" had been "sufficiently established" he would have excluded evidence of the Michigan crimes altogether.

It is a serious matter when the life of a twenty-two year old boy, now in death row at the penitentiary, depends in all probability, upon the trial court's determination as to whether or not "intent" has been "sufficiently established" in the case, especially in view of the

following remark in the findings of said court: "I consider that the question of the admissibility of evidence as to other crimes is a troublesome one, and it was only after considerable thought that the evidence objected to and referred to in the motion for new trial was admitted."

It is evident from the above that the trial court entertained grave doubts as to the admissibility of such evidence. Under the authorities the benefit of such doubts should always be resolved in favor of the accused.

This leads naturally to the inquiry as to whether or not, in any event, "intent" is an essential element of the crime here charged; was it necessary to show such intent by proof of other alleged crimes; did the fact that "he [defendant] intended to accomplish his [Ford's] death" have any bearing upon the issues herein? A conclusive answer to all of such questions is found in *Reppin v. People, supra,* where we said: "But if, as in this case, the uncontradicted evidence is to the effect that the murder was committed in the perpetration of a robbery, the murder is declared by our statute to be of the first degree, and the court, as we shall see, is required to submit to the jury the sole question of the penalty to be fixed."

Nothing is said to the effect that intent must be shown by other evidence. It necessarily follows that defendant herein is, under the statute and above decisions, guilty of murder of the first degree irrespective of his intention and the fact that he entertained the most vicious intent imaginable, and that he "intended to accomplish his [Ford's] death" when he struck the fatal blow, is wholly outside the scope of the issues in the case. The crime is fully established by showing the killing and robbery, and under the statute the introduction of unrelated and disconnected crimes in another state is a mere subterfuge and can have no effect except to inflame the minds of the jurors and cause them to impose the death penalty instead of a sentence of life imprisonment. As

stated by us in the Reppin opinion, quoting from an Illinois case: "The legislature has seen fit to clothe juries with a wide discretion in fixing the punishment to be inflicted upon one convicted of murder. Every defendant on trial for that crime is entitled to the full benefit of the statute. When all else has failed him, he has a right to stand before a jury unprejudiced by *incompetent, irrelevant* evidence, and appeal to them to spare his life."

It is quite uniformly held that where, as here, intent is not an essential element of the crime charged, or where it is established by proof of the commission of the acts constituting the crime (killing and robbery), evidence of other crimes is inadmissible. Such was the holding of the supreme court of Oregon in *State v. Willson,* 113 Ore. 450, 498, 233 Pac. 259, 271, where it said: "The evidence of other offenses in this case only tend to blacken the character of the defendant. They are not admissible to show intent for that is completely and conclusively established by the act itself if the testimonly introduced by the state is to be believed. It is contrary to the reason of the law to admit the objectionable testimony of other crimes."

In *State v. Smith,* 103 Wash. 267, 174 Pac. 9, the supreme court of Washington said: "There is no more insidious and dangerous testimony than that which attempts to convict a defendant by producing evidence of crimes other than the one for which he is on trial, and such testimony should only be admitted when clearly necessary to establish the essential elements of the charge which is being prosecuted. To establish guilty intent, unlawful motive, or criminal knowledge, it is permissible to show that the act charged against the defendant was one in a series of similar ones; but beyond this, the state cannot go and, for the purpose of securing a conviction, show the perpetration of other similar acts, even though committed in furtherance of a general scheme, where there is no proof required to establish intent, mo-

tive or knowledge, other than proof of the act charged itself. In other words, where the act charged against the defendant itself characterizes the offense, the guilty intent is proven by proving the act. Here the proof of giving of dry morphine on a prescription calling for morphine in solution was proof of the intent and nothing more was necessary to establish criminality."

In *People v. Hobbs,* 297 Ill. 399, 130 N.E. 779, 782, it is stated: "The general rule is that proof of any other offense than that for which the accused is being tried, although of a similar character, is inadmissible. Where the intent is not required to be specifically proved, or from the nature of the offense under investigation proof of its commission as charged necessarily establishes the criminal intent, or the intent is a necessary conclusion from the act done, evidence of the perpetration of other like offenses should not be admitted."

In *State v. Brown,* 3 Boyce (Del.) 499, 85 Atl. 797, 800, the court said:

"But, wherever the intent with which an alleged offense was committed is a material element of the charge, and such intent becomes an issue at the trial, proof of other similar offenses, within certain reasonable limits, is admissible, as tending to throw light upon the intention of the accused in doing the act complained of.

\* \* \*

"Where, however, the intent is not required to be specifically proved, or from the nature of the offense under investigation proof of its commission as charged necessarily establishes the criminal intent, or the intent is a necessary conclusion from the act done, evidence of the perpetration, or attempted perpetration, of other like offenses, should not be admitted."

It is said in *State v. Cragun,* 85 Utah 149, 38 P. (2d) 1071, 1078, 1079:

"Where the state is able to prove, as it did in the case at bar, the commission of the act and that its performance was not necessary to save the life of the woman,

then the criminal intent of the defendant has been shown, and evidence of other abortions on other and entirely different women is not relevant nor competent. If the defendant, although he had pleaded not guilty, claimed that the act was necessarily performed in an effort to save the life of the woman, then in rebuttal of such claim the state might well offer evidence of other abortions attempted or committed by the defendant for the purpose of disproving such claim and showing his intent in the performance of the acts for which he is being tried.

"Cases may arise where the state would be unable to prove the intent of the defendant without proving the commission, or attempted commission, by him on other women of separate and distinct offenses. Should such a case arise, then, for the purpose of proving a criminal intent, the state should be permitted to introduce such evidence on its main case, although a plea of not guilty had been entered by the defendant; *but, where the state, as was the case here, can prove the intent without relying upon separate and distinct offenses committed by the defendant, it should do so.*

\* \* \*

"It necessarily follows that the admission of this evidence was error, and that a new trial should be granted. The judgment of the court below is therefore reversed, and the case remanded for a new trial."
(Italics supplied)

In *Tinsley v. United States*, 43 F. (2d) 890, 893, the Circuit Court of Appeals stated the rule as follows: "If no question of a defendant's intent is involved, unless there is some connection between such offenses and those charged, it is manifestly unfair and unjust that evidence of like offenses to those charged in the indictment should be introduced."

It is contended in the briefs that *Hillen v. People*, 59 Colo. 280, 149 Pac. 250, cited in the court's opinion, is authority for permitting evidence of other offenses to be

introduced to prove intent. That was a murder case involving another provision of the same statute here under consideration. The defendant was convicted of murder of the first degree for killing one Chase in an *attempt* to *perpetrate* a highway *robbery*. The court admitted evidence of other robberies alleged to have been committed by the defendant before and after the act for which he was being tried. The evidence "showed that the defendant commanded deceased [Chase] to throw up his hands, and an instant later fired the fatal shot." We said: "No attempt at actual robbery was made, the defendant running away as soon as the shot was fired; and aside from the order to Chase to throw up his hands, there was nothing to characterize defendant's action as an attempt to rob. It was necessary, therefore, to establish his *intent* to commit robbery, and for that purpose evidence of other offenses is admissible, if showing or tending to show intent."

It was necessary in the above case to prove the intent to rob, and consequently, evidence of other robberies by the same individual was competent to show that his *intent* in the case on trial, was to rob the deceased. Evidence of other offenses was relevant to that issue. In the instant case it is conclusively shown by the evidence, not an *attempt* to rob as in the Hillen case, but that the defendant *did actually* rob Ford, and that part of the loot was found in his possession. In the Hillen case the question of intent was an essential element of the crime for which defendant was on trial, whereas, in the instant case, the intent is established by proof of the commission of the act. The Hillen case is clearly not in point.

In conclusion I again quote from the Reppin case: "It is impossible for us to know what the jury in this case would have done but for the introduction of this incompetent evidence, much less is it our province to say what they should have done."

MR. JUSTICE HILLIARD concurs in this dissent.